**Cathy PAULI and Gregory Pauli, Plaintiffs,**

v.

**BOARD OF EDUCATION, FARMINGTON CENTRAL COMMUNITY UNIT SCHOOL DISTRICT, DISTRICT 265, Larry Hippen, Gary Schulz, Susan Haynes, City of Farmington Police Department, Lon Howarter, and William Cale, Defendants.**

No. 91–1016.

United States District Court, C.D. Illinois.

Jan. 12, 1994.

Marilyn F. Longwell, Chicago, IL, for plaintiffs.

Jeanne L. Wysocki, Peoria, IL and John M. Myers, Springfield, IL, for defendants.

## *ORDER*

MIHM, Chief Judge.

Pending before this Court are Defendants' Motion to Dismiss or, in the alternative, for Judgment on the Pleadings (# 34), Plaintiffs' Motion to Strike Affirmative Averments (# 37), Defendants' Motion to Dismiss and Motion to Strike (# 55), and Defendants' Motion for Summary Judgment (# 69). Based on this order, Defendants' Motion to Dismiss or, in the alternative, for Judgment on the Pleadings (# 34), is granted to the extent that this Court finds Defendants are entitled to qualified immunity. The remainder of that motion is moot because this Court declines to exercise jurisdiction over Plaintiffs' state law claims.

Plaintiffs' Motion to Strike Affirmative Averments (# 37) is moot based on this Court's findings. Defendants' Motion to Dismiss and Motion to Strike (# 55) is duplicative of Defendants' Motion to Dismiss (# 34). Defendants' Motion to Dismiss (# 55) is also granted to the extent this Court finds Defendants are entitled to qualified immunity. The remainder of the motion regarding state law claims is moot. Defendants' Motion to

Strike (# 55) is also moot at this point. Defendants' Motion for Summary Judgment (# 69) is granted to the extent this Court finds Defendants are entitled to qualified immunity. The Court declines to exercise jurisdiction over Plaintiff's state law claims.

## BACKGROUND

Plaintiffs brought this suit under 42 U.S.C. § 1983 and § 1988 claiming that their fourth, fifth, ninth, and fourteenth amendment rights were violated by various local school employees and police officers. Plaintiffs also asserted several pendent state law claims.

Plaintiffs, Cathy and Gregory Pauli, are the parents of Luke Pauli, a minor, who was at all times relevant to this case a student in the Farmington Central Community Unit School District # 265 in Fulton County, Illinois. At all times relevant to this case, Defendant Hippen was the superintendent of District # 265, Defendant Schulz was the principal of Farmington High School, Defendant Haynes was a school social worker employed by District # 265, and Defendants Howarter and Cale were police officers employed by the city of Farmington. On March 23, 1993, this Court granted Plaintiffs' Motion to Dismiss Defendants City of Farmington and Officers Howarter and Cale.

A few weeks after the beginning of his freshman year in high school, Luke broke up with his eighth grade girlfriend. Luke was upset by the break-up. During the week after the break-up, Luke began meeting with Stephanie Churchill, a counselor at the high school, and with Haynes. Luke also recalls meeting with Don Costelli, another counselor at the high school, a few times. In early October 1990, Churchill felt it necessary to have Luke sign a form "contract," in which Luke agreed not to physically injure himself. Prior to October 24, 1990, the Paulis were not informed that Luke had received any counseling by Haynes, Churchill, or Costelli.

The Paulis' Second Amended Complaint alleges that on October 24, 1990, while attending Farmington High School, Luke Pauli informed Defendant Susan Haynes that he did not want to go home because his mother had verbally abused him by saying that he was lazy and calling him a savage. Upon being told by Luke that he did not want to go home, Haynes transported Luke to the county "jail"[1] without first contacting his parents. Del Sutter, a Crisis Intervention Counselor, then contacted Cathy Pauli. The Paulis went to the Crisis Intervention Center and were told by Sutter that Haynes had brought Luke there because he did not want to go home and Haynes thought Luke was being abused. Haynes then accused Cathy of "verbally abusing" Luke by calling him a "savage," which Cathy denied. Haynes told the Paulis that Luke would be placed in an alternative living arrangement and could not go home with the Paulis. Cathy Pauli signed a "Consent for Treatment" form on behalf of Luke, but she refused to sign a "Consent for Foster Care" form for him. The Paulis left the meeting after being told that Luke would be staying with another family, the Welkers, for a couple of days.[2]

Upon returning home that evening, Cathy Pauli telephoned Defendant Schulz at his home and advised him that Haynes had taken Luke to the "jail" and would not let him return home. After speaking with Haynes, Schulz called Cathy back and told her that Luke was going to stay in the alternative living arrangement until the situation was resolved.

On Friday, October 26, Luke became aware of the fact that his parents expected him to ride the bus home that afternoon. Luke then went to school counselors and again stated that he refused to go home. A series of telephone calls to and from Haynes, Cathy Pauli and Del Sutter ensued. The Paulis became aware of the fact that Luke

---

1. In their pleadings, Defendants state that Haynes took Luke to the Crisis Intervention Center located on the premises of the Peoria County Sheriff's Department. Plaintiffs do not allege that Luke was jailed or arrested.

2. The parties dispute which day Luke was to return home. The Paulis claim that Luke was to

return home on Friday. Haynes thought Luke was to remain outside of his parents' home until Monday. In his deposition testimony, Luke stated that he thought he was going to be staying with the Welkers for a week to two weeks. (Luke deposition, p. 56).

would not be riding the bus home that afternoon. The Paulis and their two older sons then proceeded to Luke's school. Schulz had someone call the Farmington Police Department at about 4:30 and request the presence of an officer. Schulz also called school superintendent Hippen.

The Paulis then met with Haynes, Hippen, and Schulz at the high school to discuss the situation. No one from the Crisis Intervention Center was present or in contact with anyone in the meeting while the meeting was in progress. At the beginning of the meeting, Cathy Pauli asked Luke what was going on. Luke replied that he was sick of things at home and was not going home. Haynes stated that an agreement had been made on Wednesday that Luke would remain outside of the Paulis' home until a counselling session had taken place. The Paulis denied that any such agreement was made. While the meeting was in progress, two uniformed police officers arrived at the school and remained outside Schulz's office until the end of the meeting. After about two hours, the Paulis determined that the Defendants would not permit them to take Luke home, and the Paulis and their two older sons left the high school. Luke was taken back to the Welkers' home by one of the police officers.

On Monday, October 29, the Paulis, Luke, and Del Sutter participated in a counselling session at the Paulis' home. Luke stayed at the Welkers' residence until October 31 when he returned to his parents' home.

## DISCUSSION

### A. Qualified Immunity

■ Defendants have moved for summary judgment on the basis that they are entitled to qualified immunity from Plaintiffs' claims. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, this Court construes the facts alleged in the light most favorable to the non-moving party. *Stumph v. Thomas &*

*Skinner, Inc.,* 770 F.2d 93, 97 (7th Cir.1985). For the reasons set forth below, this Court finds that Defendants are entitled to qualified immunity.

### 1. Liberty Interest: Short-term Physical Custody

Government officials performing discretionary functions are shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Landstrom v. Illinois Department of Children and Family Services,* 892 F.2d 670, 675 (7th Cir. 1990) *citing Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The Seventh Circuit has outlined the following approach to qualified immunity questions:

Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law. *Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

Therefore, the specific issue in this case is whether parents of a fourteen year old child, who at meetings with both school officials and his parents refused to return to his parents' home, had a clearly established right to be free from having their son placed outside of their home in alternative housing for five nights, and that the school employees reasonably should have known of those parental rights.

A prior case that is "precisely on all fours on the facts and law involved here" is not required to overcome a defense of qualified immunity. *Landstrom,* 892 F.2d at 676. Instead, a " 'sufficient consensus,' based on all relevant case law, 'indicating that the official's conduct was unlawful' " is required. *Id.* "The contours of the right must be sufficiently clear that a reasonable official would un-

derstand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In addition, "whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under ... *Harlow.*" *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.1986).

The Paulis have the burden of demonstrating that the Defendants violated a constitutional right that was clearly established in October 1990. *Conner v. Reinhard,* 847 F.2d 384, 388 (7th Cir.1988). The Paulis rely on *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), *Drollinger v. Milligan,* 552 F.2d 1220 (7th Cir.1977), *Duchesne v. Sugarman,* 566 F.2d 817 (2nd Cir.1977), *Lossman v. Pekarske,* 707 F.2d 288 (7th Cir.1983) and *Robison v. Via,* 821 F.2d 913 (2nd Cir.1987). These cases do not set out a "factual roadmap of constitutionally violative conduct against which defendants here could have measured their own proposed course of conduct." *Landstrom,* 892 F.2d at 677. In fact, the cases relied on by Plaintiffs tend to support the position of Defendants in this case.

In *Santosky,* the Supreme Court emphasized that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest more precious than any property right. *Santosky v. Kramer,* 455 U.S. 745, 757–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599, (1982). At issue in *Santosky* was what standard of proof was required by a state when a state attempts to permanently deprive parents of their parental rights. The *Santosky* Court held that a state must support its allegations by at least clear and convincing evidence before it completely and irrevocably deprives a natural parent of custody. *Id.* at 1391–92. The facts and holding of *Santosky* do not provide any guidance for the school officials in this case. Whether a state has to support its decision in a hearing to permanently deprive parents of custody of their children by a clear and convincing standard or a preponderance of the evidence standard

provides no guidance for school officials dealing with a fourteen year old boy who refuses to return to his parents' home from school.

In *Stanley,* the Court emphasized that "the rights to conceive and to raise one's children have been deemed 'essential.'" *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). The *Stanley* Court held unconstitutional an Illinois statute which presumed unwed fathers to be unfit parents and permanently deprived unwed fathers of custody upon death of the mother without any hearing. *Stanley,* 405 U.S. at 658, 92 S.Ct. at 1212. In contrast to the facts of *Stanley,* the school officials in this case did not permanently deprive the Paulis of the custody of Luke without a hearing. Instead, the school officials placed Luke in alternative housing for five nights as a result of Luke's refusal to return to his parents' home.

In *Drollinger,* a grandfather objected to the provisions of his daughter-in-law's five year probation which restricted his ability to associate with his daughter-in-law and granddaughter. *Drollinger v. Milligan,* 552 F.2d 1220, 1224 (7th Cir.1977). The *Drollinger* court stated, "The interest in the custody and care of a child by his family has been deemed 'essential' and has been granted paramount importance within our constitutional framework." *Id.* at 1226–27. The court found that the terms and conditions of the daughter-in-law's five year probation seriously limited the grandfather's ability to care for his granddaughter. Therefore, the court held that due process required the state to provide a hearing in which those family members whose privacy interests were being impaired would have the opportunity to respond to the state's reasons for limiting their civil right to care for other family members. *Id.* at 1227. In contrast to the state in *Drollinger,* in this case the school officials did not deprive the Paulis of their right to care for Luke for a lengthy, extended period of time like five years. Instead, the school officials fashioned a temporary solution to address the immediate problem of a fourteen year old boy who refused to return to his parents' home and who had signed a contract promising not to

physically injure himself just two weeks earlier.

In *Duchesne,* Perez, a mother of two children, went to get medical attention for emotional problems and left her children with a neighbor. *Duchesne v. Sugarman,* 566 F.2d 817, 822 (2nd Cir.1977). Perez expected to receive outpatient care and return home that same day but was instead admitted to a hospital where she stayed for the next six days. The neighbor informed the police that she could not care for Perez's children for more than one night. *Id.* The same day Perez was admitted to the hospital, a New York City Bureau of Child Welfare representative visited Perez in the hospital and attempted to have Perez sign a form granting consent to the Bureau to obtain custody. *Id.* Perez refused to sign the form despite assurances that she could have the children back as soon as she left the hospital and was able to provide proper care. *Id.* Without Perez's consent, the Bureau assumed custody of the children.

When Perez was released from the hospital, she immediately demanded the return of her children. Despite Perez's repeated request for the return of her children, the state retained custody of the children for thirty-six months after the initial emergency without obtaining judicial authorization. *Id.* at 826. The court held that the state's initial physical removal of the children was constitutional even without explicit parental consent. *Id.* at 827. However, the state's failure to obtain judicial ratification of their decision to maintain the custody of the children constituted a violation of due process. *Id.* at 828. In contrast, Defendant school officials here placed Luke in alternative housing for five nights and not for an extended period of time like thirty-six months.

This Court does not consider five nights to be an insignificant period of time for Luke to have been kept out of his parents' custody and control. However, the unconstitutional lengths of time children were kept away from their grandparent in *Drollinger* (potentially five years) and parent in *Duchesne* (thirty-six months) are not sufficiently analogous to placing Luke in alternative housing for five nights to have put Defendants on notice that their conduct violated a clearly established right of Plaintiffs.

In *Lossman v. Pekarske,* Lossman had legal custody of his three children and was divorced from the children's mother. *Lossman v. Pekarske,* 707 F.2d 288, 289 (7th Cir.1983). Lossman owned a bar and lived in the back with his three children. On March 28, 1980, Lossman's current wife (the children's stepmother) complained to a county social worker that Lossman was beating the children. Both the children's natural mother and stepmother were interviewed by a police officer and stated that Lossman was constantly drunk, beat and kicked the children brutally, threatened to kill them, kept loaded guns around the house, made one of the children tend bar, and fed them inadequately. The presence of the guns made the police decide to remove the children directly from school instead of waiting until they arrived home. On April 9, 1980, a hearing was held, and the court ordered the foster home to continue to have custody of the children and gave Lossman visitation rights. The *Lossman* court held that on March 28, Lossman was a menace to his children, and therefore, there was no denial of due process in depriving Lossman of the temporary custody of his children. *Id.* at 292.

In *Robison v. Via,* the Court held that a Vermont state trooper and assistant state's attorney were entitled to qualified immunity from any due process claim asserted by a mother in a § 1983 suit based on their taking her son and daughter into custody to investigate abuse reports. 821 F.2d 913, 922 (2nd Cir.1987). The court found that it was objectively reasonable for the defendants to believe that they violated no federal rights when they seized the children because two of the daughter's schoolmates reported the daughter's descriptions of ongoing sexual abuse by her father and at least one of the schoolmates reported physical abuse of the son by the father. *Robison,* 821 F.2d at 922–23.

█ The above cases demonstrate that parents clearly have a fundamental liberty interest in the care, custody, and management of their children which is protected by the Fourteenth Amendment. However, as

*Duchesne, Lossman,* and *Robison* illustrate, parents' strong interest in the care, custody, and management of their children is not absolute. In "emergency" situations, including situations of suspected parental abuse or neglect, public officials can temporarily remove children from the custody of their parents without parental consent or a predeprivation hearing.

Although the Paulis had not allegedly physically or sexually abused Luke like the facts in *Lossman* and *Robison,* the school officials clearly faced an emergency situation. On October 11, 1990, one of the school social workers felt it necessary to have Luke sign a form "contract" promising that he would not follow-through with any plans to hurt himself without first attempting to contact various peer counselors and school officials. Then, on both October 24 and 26 at meetings with his parents and school officials, Luke refused to return to his parents' home. These undisputed facts created a serious "emergency" situation which the school officials dealt with by temporarily placing Luke in an alternative living arrangement for five nights. Based on all of the undisputed evidence in the record, read in the light most favorable to the Paulis, this Court finds that Defendants' conduct did not violate clearly established statutory [3] or constitutional rights of Plaintiffs which a reasonable person would have known. *Green v. Carlson,* 826 F.2d 647, 650 (7th Cir.1987).

The Paulis argue that when Luke told the school officials that he did not want to go home on October 24 and October 26, 1990, "he did so after several weeks of coaching by Haynes and other school counselors." Perhaps school officials should not have counseled Luke that he did not have to go home if he did not want to. However, it is not alleged that it was constitutionally improper for Defendants to have given Luke such information. Once Luke made the statements to school officials that he refused to return to his parents' home, an emergency situation existed for school officials.

This Court wants to make clear that it fully subscribes to the idea that parental rights in the care, custody, and management of their children are substantial. This Court is disturbed by the fact that the school officials did not obtain the Paulis' consent prior to Luke receiving counselling with regard to "self-esteem" issues. This Court is also troubled by the failure of the school officials to insist that the Crisis Intervention Center be involved in the Friday meeting at the school with the Paulis and the school officials. This Court feels that once Crisis Intervention became involved, the school officials should not

---

**3.** The only state statute relevant to the facts of this case is the section of the Illinois Juvenile Court Act pertaining to Minors Requiring Authoritative Intervention ("MRAI"). 705 ILCS 405/3–1 *et seq.* (1993). Under Section 405/3–4, a law enforcement officer may, without a warrant, take a minor into limited custody in certain situations. A law enforcement officer can also make arrangements for transporting the minor to an agency or association providing crisis intervention services. 705 ILCS 405/3–4(d). According to Section 405/3–5(b), "An agency or association is authorized to permit a minor to be sheltered in a temporary living arrangement provided the agency seeks to effect the minor's return home or alternative living arrangements agreeable to the minor and the parent, guardian or custodian as soon as practicable." That same section provides that "[n]o minor shall be sheltered in a temporary living arrangement for more than 48 hours, excluding Saturdays, Sundays and court-designated holidays, without parental consent unless the agency documents its unsuccessful efforts to contact a parent or guardian, including recording the date and time and staff involved in all telephone calls, telegrams, letters, and personal contacts to obtain the consent or authority, in

which case the minor may be so sheltered for not more than 21 days." 705 ILCS 405/3–5(b).

This Court can not find and the Paulis have not pointed to any provision of the MRAI that school officials allegedly violated. In fact, the Paulis argue that "*Defendants cannot seek refuge from the consequences of having deprived the Paulis of their constitutional rights by claiming to have complied with the provisions of the Illinois Juvenile Court Act pertaining to Minors Requiring Authoritative Intervention since MRAI does not vest these Defendants with any authority whatsoever.*" (Plaintiffs' Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment, Motion to Dismiss and Motion to Strike, p. 30). The above MRAI provisions apply to law enforcement officers and an agency or association providing crisis intervention services. If the MRAI was invoked, school officials appear to have been under no legal duty to ensure that the appropriate MRAI procedures regarding the temporary custody of Luke were followed. Therefore, if the MRAI was violated, it was not the conduct of school officials that violated Plaintiffs' clearly established statutory rights in that regard.

have continued to play the starring role that they did. The conflicts that occurred on Friday between the Paulis and the school officials should have been resolved by Crisis Intervention pursuant to the MRAI statute and not by the school officials. Based on these facts, this Court is not completely comfortable ruling in favor of the school officials. These facts, however, do not change this Court's conclusion that in October of 1990, the school officials were not on notice that their conduct was violating a clearly established constitutional right of the Paulis. Therefore, this Court would be less comfortable ruling in favor of the Paulis.

### Liberty Interest: Reputation

■ The Paulis' complaint alleges that the school officials' conduct deprived them of their liberty interest by creating "a cloud upon Plaintiffs' reputation and standing in the community without Plaintiffs' having an opportunity to be heard." This Court finds that Defendants are entitled to qualified immunity from this claim.

The Paulis have not cited one case which demonstrates that the school officials' conduct violated a clearly established right of the Paulis. None of the cases cited by the Paulis or found by this Court dealing with familial liberty interests discusses injury to parents' reputation, and many of the cases analyzing constitutional injury to reputation have occurred in the employment context.

### Liberty Interest: Unrestricted Freedom of Movement

■ The Paulis claim that the school officials' actions "restricted Plaintiffs' freedom of movement, thus constituting a personal seizure without justification and without due process." This Court assumes that the Paulis' reference to "Defendants" includes the school Defendants as well as the previously-dismissed police Defendants.

Plaintiffs have the burden of demonstrating that the Defendants violated a clearly established constitutional right of Plaintiffs. Plaintiffs have not cited any case law holding that persons who are not law enforcement officers effect a seizure or a constitutional deprivation of liberty under the factual circumstances of this case. Therefore, the Court finds that the school Defendants are entitled to qualified immunity from this claim of the Paulis.

### B. State Law Claims

■ Both parties have urged this Court to retain jurisdiction over the Paulis' state law claims if it grants the school Defendants summary judgment with respect to the Paulis' § 1983 claims. This Court has jurisdiction over Plaintiffs' state law claims only as a result of supplemental jurisdiction. 28 U.S.C. § 1367. This Court may decline to exercise supplemental jurisdiction over state law claims where it has dismissed all claims over which it possesses original jurisdiction. 28 U.S.C. § 1367(c)(3).

The Seventh Circuit has held that when a district court dismisses all federal claims before trial, that court should not retain jurisdiction over the state law claims absent extraordinary circumstance. *Wentzka v. Gellman,* 991 F.2d 423, 425 (7th Cir.1993). The *Wentzka* court identified three types of extraordinary circumstances: the existence of a federal defense to a state law claim; some other basis of federal jurisdiction; and the running of the statute of limitations on the filing of pendent claims in state court. *Id.*

Defendants argue that this case been before this court for over two years and it would be inefficient to decline jurisdiction at this point. In *Graf,* the court stated that a district court's exercise of pendent jurisdiction may be appropriate after the dismissal of the federal cause of action, if substantial judicial resources have already been expended in the litigation. *Graf v. Elgin, Joliet and Eastern Railroad Company,* 790 F.2d 1341, 1347 (7th Cir.1986). However, in *Wentzka,* the Seventh Circuit made clear that its holding in *Graf* was based on the fact that an issue of federal law was raised as a defense to the remaining state law claim. *Id.* Therefore, this Court finds that the fact that this case has been pending for over two years is not an extraordinary circumstance and declines to exercise pendent jurisdiction over the Paulis' state law claims.

## CONCLUSION

For the reasons set forth above, this Court GRANTS Defendants' Motion for Summary Judgment to the extent that this Court finds Defendants entitled to qualified immunity from Plaintiffs' section 1983 claims. This Court declines to exercise pendent jurisdiction over Plaintiffs' state law claims. The clerk is ordered to enter judgment with costs in favor of the Defendants and against the Plaintiffs.